UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| TRAXCELL TECHNOLOGIES, LLC., ) <br>        Plaintiff, ) <br> ) <br> v. ) <br> ) <br> AT&T CORP. AND AT&T MOBILITY ) <br> LLC, ) <br>        Defendants. ) <br> _____ ) <br> v. ) <br> ) <br> VERIZON WIRELESS PERSONAL ) <br> COMMUNICATIONS LP, ) <br> ) <br>        Defendants. ) | NO. 2:17-cv-00718-RWS-RSP <br> (CONSOLIDATED LEAD CASE) <br><br><br><br><br><br><br> NO. 2:17-CV-00721-RWS-RSP |

**PLAINTIFF'S MOTION TO COMPEL DEFENDANT VERIZON'S DAMAGES RELATED DOCUMENTS AND TESTIMONY**

I. **STATEMENT OF FACTS**

Defendant Verizon offers wireless networks, components, and devices that practice the asserted claims of the patents-in-suit. Beginning around June 2016, Verizon's wireless network implemented Ericsson's C-SON system to generate reports including location information.[1] This system is used to optimize performance of Verizon's wireless network by imparting Self Optimizing or Self

---

[1] Ex. 1, Rice depo. at 66:4-14, which is being FILED UNDER SEAL; VZW_TRAXCELL_00000438-466 (Contains a report with adjacencies, original and optimized parameter values, distances, KPIs and actions taken by ANR Augmentation.), which is being FILED UNDER SEAL; VZW_TRAXCELL_00000467-506.), which is being FILED UNDER SEAL.

1

Organizing Network capabilities to the wireless network.[2] Thus, damages information and documents related to Verizon's implementation of SON are relevant here. In addition, this case involves the '388 patent whose claims include a wireless mobile communications device component not recited in the claims of the '024, '284, and '320 patents previously asserted against Nokia in *Traxcell Techs., LLC v. Nokia Solutions*, 2:17-cv-0044-RWS-RSP.[3] Hence, damages here necessarily involve information regarding the costs, revenues, benefits, and so on related to the wireless handsets themselves.

    A. **THE LOCAL RULES REQUIRE PRODUCTION WITHOUT REQUEST, BUT VERIZON DID NOT PRODUCE DOCUMENTS AND TESTIMONY RELATED TO THE FOLLOWING RELEVANT CATEGORIES**

Consistent with Eastern District of Texas General Order 14-3 ("General Order Regarding Track B Initial Patent Case Management Order") at Track B Initial Patent Case Management Order, ¶ 2 ("Initial Disclosures and Summary Sales Information"), the Court in the present case more than 12 months ago ordered the production of "all documents, electronically stored information, and tangible things . . . relevant to the pleaded claims or defenses[.]"[4] Further, the courts have repeatedly

---

[2]    Ex. 2, Rice depo. at 102:17-106:10; 164:12-165:15; 167:1-170:18; 176:2-177:7; 178:3-179:22; 181:7-24.), which is being FILED UNDER SEAL.
[3]    *See* Ex. 3, U.S. Patent No. 9,549,388, claims.
[4]    May 4, 2018 Discovery Order (ECF No. 44) at ¶ 3(b).

held that a patent plaintiff is entitled to the underlying financial information.[5]

Yet, Verizon did not produce documents or testimony related to the following categories:[6]

1. Verizon's implementation of SON, in terms of:

   a. Network costs (CAPEX, such as spending on cell towers and base stations on an annual basis starting before SON was implemented until the present, and OPEX, such as network operating expenses on an annual basis starting before SON was implemented until the present).

   b. quality of service before SON as compared to after SON (e.g., dropped calls, call quality, customer satisfaction on an annual basis starting before SON was implemented until the present).

   c. Personnel costs for optimizing Verizon's wireless network immediately before SON as compared to after SON, i.e. how many personnel hours to monitor and optimize network before SON and after SON (what is the costs per base station/cell for personnel monitoring and optimizing the network).

2. Verizon licenses associated with:

   a. Collecting and using location data of a wireless device through systems not including the SON system or through API's.

   b. Directional assistance wherein a wireless device accesses mapping data across the wireless network but not collected through the API's.

---

[5] *E.g., Crocs, Inc. v. Effervescent, Inc.*, No. 06-cv-00605-PAB-KMT, 2017 U.S. Dist. LEXIS 194609, at *4–10 (D. Co. Nov. 28, 2017*); Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 260 (W.D.N.Y. 2013); *Fellowes, Inc. v. Aurora Corp.*, 2009 U.S. Dist. LEXIS 38768, at *8 (N.D. Ill. Apr. 1, 2009); see also Eastern District of Texas General Order 14-3 ("General Order Regarding Track B Initial Patent Case Management Order") at Track B Initial Patent Case Management Order, ¶ 2.

[6] *See* Ex. 4, Declaration of William P. Ramey, III ("Ramey Decl.") at ¶3, (Exhibit ["Ex."] 1) May 30, 2019 email from William Ramey to counsel for Verizon summarizing results of meet and confer on discovery issues; *Id.* at ¶4, Ex. 2, June 5, 2019 email from William Ramey to counsel for Verizon requesting 30(b)(6) testimony.

3

3. Methods and systems used by Verizon to generate an indication of location of a wireless device through systems not including the SON system or through API's.

4. Wireless subscriber revenue, itemized for services charged such as data, voice, and messaging.

5. Wireless device revenue earned by Verizon for the sales of wireless devices.

6. Revenue data for data service on Verizon's network (broken down by technology type, 2G, 3G, 4G (LTE), and 5G).

7. Volume of data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G.

8. Volume of Google Maps data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G.

9. Volume of VM Navigator data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G.

10. Volume of other directional assistance programs data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G.

11. Detailed Verizon income statement by account from the general ledger, with breakout/allocation for voice/data/messaging.

12. Revenue earned by Verizon from location data of a wireless device. (including all monies/benefits Verizon receives for providing access to a wireless device's location data and revenue from selling the location information).

13. The percentage of wireless devices that allow access to location data.

14. The percentage of wireless devices that block access to location data.

15. The percentage of wireless devices that block access to location data on an application basis.

Traxcell's damages experts have requested this material, including documents provided to Verizon by their vendor Ericsson, in order to prepare their opinions on damages including the appropriate reasonable royalty in this case.[7]

### B. TRAXCELL SOUGHT THE DAMAGES DOCUMENTS AND TESTIMONY THROUGH DISCOVERY

Despite the automatic nature of required document production in this case, Traxcell served Verizon with request for production to help provide Verizon with guidance as to categories of documents Traxcell believed were necessary. Traxcell served these requests in May and December of 2018 along with its First Set of Interrogatories.[8] Also in December 2018, Traxcell served Verizon with its 30(b)(6) deposition notice including topics encompassing the above listed subject matter.[9]

Verizon responded by email to Traxcell's document requests arguing that the Court's discovery order made such requests unnecessary.[10] Traxcell urged that the requests reflected that Verizon's production was deficient in certain categories of documents.[11] Yet, Verizon did not agree to supplement its production in response to the requests.

Moreover, Verizon did not provide 30(b)(6) witnesses until May 2019—five

---

[7] *Id.* at ¶5.
[8]   *Id.* at ¶6, Ex. 3, Plaintiff's First Set of RFPs; *Id.* at ¶7, Ex.4, Plaintiff's Second Set of RFPs, *Id.* at ¶8, Ex. 5, Plaintiff's First Set of ROGs.
[9]   *Id.* at ¶9, Ex. 6, Plaintiff's Notice of Deposition for Verizon, Schedule A.
[10]   *Id.* at ¶10.
[11]   *Id.* at ¶11.

months after Traxcell served its first 30(b)(6) notice.[12] After the 30(b)(6) depositions, Traxcell promptly notified Verizon that Verizon's production was still deficient.[13] Traxcell, per the Local Rules of this Court, requested a meet and confer, which the parties attended on May 29, 2019.[14] The meet and confer, unfortunately, was largely unsuccessful in resolving the issue with Verizon's insufficient discovery.[15]

## II. MOTION TO COMPEL – ARGUMENT

### A. DEFENDANTS SHOULD BE COMPELLED TO PROVIDE COMPLETE PRODUCTION IN RESPONSE TO CERTAIN REQUESTS FOR PRODUCTION

Here, Verizon produced essentially zero documents and testimony related to financial information in the categories listed above for the products and systems identified in Plaintiff's infringement contentions. If Verizon recognized revenue, no matter how recognized, that revenue information and supporting documentation should be produced. Due to the lack of production, after Verizon does produce the responsive documents, Traxcell requests a second 30(b)(6) deposition on financial matters.

---

[12] *Id.* at ¶12.
[13] *Id.* at ¶13, Ex. 7, May 16, 2019 email from William Ramey to counsel re: needed information after depositions and request for meet and confer.
[14] *Id.* at ¶3, Ex. 1, May 30, 2019 email from William Ramey to counsel for Verizon summarizing results of meet and confer on discovery issues.
[15] *Id.*

In response to requests for production relating to monetary information (e.g., revenue, costs, profits, licenses, sales volume, annual reports, and financial reports) relating to the Accused Instrumentalities,[16] Verizon asserted meritless objections and failed to fully produce responsive documents and, instead, have produced little responsive information. The pertinent Requests include at least Requests Nos. 1-38 and 48 of the First Set and all of the requests of the Second Set.[17]

Verizon appears to rely on decisions in related cases to attempt to justify its failure to produce.[18] However, those cases did not explicitly involve claims with a recited wireless mobile communications device component, like those of the '388 patent-in-suit in this case.[19] Also, independent asserted claims 1, 11, and 21 of the '388 patent recite a processor that can "generate an indication of a location of the wireless mobile communications device with respect to geographic features."[20] As such, documents and testimony related to financial aspects of location determination for a wireless handset device are relevant in this case. Thus, the cost and revenue and other financial information associated with the operation of the wireless handset and location determination itself is at issue here, whereas it was arguably not at issue in the cases limited to the other patents-in-suit.

---

[16] The precise nature of each request is set forth by the language of each request.
[17] *Id.* at ¶6, Ex. 3, Plaintiff's First Set of RFPs; *Id.* at ¶7, Ex.4, Plaintiff's Second Set of RFPs.
[18] *Id.* at ¶14.
[19] See Ex. 3, U.S. Patent No. 9,549,388, claims.
[20] *Id*. at claim 1. Claims 11 and 21 have limitations with similar language.

Regarding the scope of discovery, Traxcell notes that direct-infringement liability can exist for conduct commonly associated with designing (i.e., creating a design that meets the patent claim elements);[21] licensing (i.e., licensing technology that meets the patent claim elements);[22] and testing;[23] and that indirect infringement

---

[21] *ePlus, Inc. v. Lawson Software, Inc.*, 789 F.3d 1349, 1361 n.13 (Fed. Cir. 2015); *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1195 (Fed. Cir. 1996) (quoting the *Weyerhaeuser* language provided in the following citation); *Weyerhaeuser Timber Co. v. Bostitch, Inc.*, 178 F. Supp. 757, 760 (D. R.I. 1959) (stating, "And even though the grant of said license and *the delivery of said designs and patterns* [emphasis added] occurred before the date of the reissue patent, such acts would constitute infringing conduct if they were performed with intent to infringe the forthcoming reissue patent or with intent that said infringing conduct would continue after the reissue patent was granted. [Citations omitted]."); *Hewlett Packard Co. v. Papst Licensing GmbH & Co. (In re Papst Licensing GmbH & Co.)*, 767 F. Supp. 2d 1, 10 (D. D.C. 2011) (stating, " Underlying the customer-suit doctrine is the preference that infringement determinations should be made in suits involving the *true defendant, the party that controls the product's design* [emphasis added], rather than suits involving secondary parties, such as customers of the manufacturer."); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 509 (D. N.J. 2011) (stating, "[I]t is the *design* [emphasis added], . . . , and . . . of allegedly infringing products that gives rise to any infringement claim[.]"); *Symbol Techs., Inc. v. Metrologic Instruments, Inc.*, 771 F. Supp. 1390, 1403 n.11 (D. N.J. 1991)    (holding direct infringement was proper where an individual "participated in *the design of* [emphasis added] the infringing device and preparation of the sales bulletin. [Citation omitted].").

[22] *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1195 (Fed. Cir. 1996) (quoting the *Weyerhaeuser* language provided in the following citation); *Weyerhaeuser Timber Co. v. Bostitch, Inc.*, 178 F. Supp. 757, 760 (D. R.I. 1959) (stating, "And even though the *grant of said license and the delivery of said designs and patterns* [emphasis added] occurred before the date of the reissue patent, such acts would constitute infringing conduct if they were performed with intent to infringe the forthcoming reissue patent or with intent that said infringing conduct would continue after the reissue patent was granted. [Citations omitted]."); *Moseley v. United States Appliance Corp.*, 155 F.2d 25, 27 (9th Cir. 1946) (stating, "The *act of licensing* [emphasis added] . . . to manufacture and sell the infringing device was itself an act of infringement. [Footnoted citations omitted]. . . . The evidence shows that Keelmo Company was formed for the purpose of infringing appellee's patent *by licensing* [emphasis added] the manufacture and sale of the infringing device.").

[23] *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 18, 19 (Fed. Cir. 1984) (stating, "[I]f the infringer has tested his embodiment of the invention sufficiently to satisfy him, this may be may be a[n] [infringing] 'use,' because [ . . . ] 'use' includes use for the purpose of testing."); *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1372–3 (Fed. Cir. 2003)  (noting in part, in denying summary judgment of non-infringement, the defendant's use by performing experiments); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 509 (D. N.J. 2011) (stating, "[I]t is the design, *implementation* [emphasis added], manufacturing,

can exist for common technology licensor conduct of designing, licensing, and supporting (e.g., providing instructions, technical consultants, technical phone support).[24] Traxcell also notes that the categories of documents and testimony listed

---

marketing, and sales of allegedly infringing products that gives rise to any infringement claim[.]").

[24] *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) (stating, "*design of* [emphasis added] infringing product may constitute active inducement" [citing 4 D. Chisum, *supra*, § 17.04[4][d], at 17-52]); *id.* (noting, as support for induced infringement finding, the defendant had "given all of the [infringing material] *formulas* [emphasis added] to" the direct infringer); *id.* (noting, as support for induced infringement finding, the defendant had "exerted control over [direct infringer] manufacture of the infringing [materials], as the owner of the trademark POCKET PURIFIER used by [direct infringer] on its product and through license agreements. See Amendment to Agreement between William J. Gartner and Calco Ltd. of Sept. 24, 1980, at 2 (Jan. 26, 1983) ('GARTNER grants to CALCO an exclusive license to manufacture and sell the purifying straw, *the construction of which shall have been approved by Gartner* [Court's emphasis]')."); *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 411 n.11 (5th Cir. 1963) (stating, regarding inducing infringement, "'The following has been adjudged infringing conduct: *licensing others* [emphasis added] to use infringing machines and processes * * *; fitting machinery for operation at the purchaser's plant; * * * converting machinery or adjusting operating parts * * *; passing on information intending to bring about infringement, ( Jones v. Radio Corp. of America, 131 F.Supp. 82); *Furnishing drawings and granting license* [emphasis added] ( Weyerhauser Timber Co. v. Bostich, D.C., 178 F.Supp. 757, accused machines, Conmear Products Corp. v. Tibony, 63 F.Supp. 372); . . .' [Citation omitted]. The cited Jones v. RCA case gives a good summary of pre-1952 Code decisions as to acts inducing infringement even without sales."); *Csb-System Int'l Inc. v. SAP Am., Inc.*, No. 10-2156, 2012, U.S. Dist. LEXIS 60909; 2012 WL 1521321, at **26, 28 (E.D. Pa. Apr. 30, 2012) (stating, "Courts have found the range of infringing acts to include actions such as support services and repair. [Citations omitted]; *Symbol Techs., Inc. v. Metrologic Instruments, Inc.*, 771 F. Supp. 1390, 1405 (D.N.J. 1991) (finding that acts of repair and maintenance [ . . . ] may lead to liability for inducement; and further noting that 'conduct including *licensing* [emphasis added], repair and maintenance, instruction and advertising, *design* [emphasis added] and . . . have been sufficient to hold one liable for'" inducing infringement); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 434 (S.D. N.Y. 2011) (finding defendant "'materially contributed' to the infringement by *designing* [emphasis added], . . . , supporting, and . . . the [infringing] program. [Citations omitted]"); *ProteoTech, Inc. v. Unicity Int'l, Inc.*, 547 F. Supp. 2d 1174, 1178 (W.D. Wash. 2008) (stating, "Here, in contrast, ProteoTech alleges that Rexall had a subsidiary relationship with the company that through various acquisitions became part of the corporate entity now accused of infringing the patent ProteoTech licensed to Rexall. The case now before the Court is simply not one in which the alleged inducer had no connection to the alleged infringer, and Rexall's *'mere licensing' theory* [emphasis added] does not support dismissal of ProteoTech's claim of patent infringement."); *Alta. Telecomms. Research Ctr. v. Rambus, Inc.*, No. C-06-02595 RMW, 2006 U.S. Dist. LEXIS 81093, at **14–15 (N.D. Cal. Oct. 24, 2006)

above is relevant to a proper analysis of the *Georgia Pacific* factors in determining a reasonable royalty.[25]

---

(find that pleading of product testing and other services offered along with licensor's licenses and that the technology infringed specific patent claims sufficiently met indirect patent-infringement pleading standards); *Vesture Corp. v. Thermal Solutions, Inc.*, 284 F. Supp. 2d 290, 317 (M.D. N.C. 2003) (noting that inducing infringement may be based on designing of a product).

[25] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry"); *see also Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), listing the factors as follows:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor.
>
> 6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
>
> 7. The duration of the patent and the term of the license.
>
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

## B. DEFENDANTS SHOULD BE COMPELLED TO PROVIDE COMPLETE ANSWERS TO INTERROGATORY NO. 6.

Plaintiff's Interrogatory No. 6 asks:

**INTERROGATORY NO. 6:**

For each Accused Product, state, on a product-by-product basis, the revenues received, costs incurred, and profits received, relating to sale or use in the U.S. or export from the U.S. of such product since January 1, 2010. The information should be provided at the unique product number level and may be provided on either a monthly or a quarterly basis as is likely reflected in reporting packages distributed to Defendant's management on a periodic basis in, for example, profit and loss statements or income statements, balance sheets, statements of cash flows, revenue forecasts, profit forecasts, demand forecasts, market share reports or forecasts, or similar reports. To the extent that such information is not available, Defendant shall provide revenue, cost and profit information at the most detailed level reasonably available to

---

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Defendant.[26]

Defendants' "General Objections" are improper.[27] Likewise, Defendants' boilerplate objections[28] are waived by their boilerplate nature.[29]

In response, Verizon merely identified a made-for litigation chart allegedly showing overall revenues and costs for VZ Navigator between 2016 and 2019.[30] Traxcell is entitled to test those figures by reviewing the documents and testimony of Verizon related to the accused instrumentalities.

The accused-instrumentalities' monetary information is relevant and discoverable. Verizon's objections to Interrogatory No. 6 should be overruled, and Verizon should be ordered to fully answer Interrogatory No. 6.

Traxcell's e-mail of May 16, 2019, particularly lays out the damages data

---

[26] *See* Ex. 4, Ramey Decl. at ¶15, Ex 8, First Amended Resp. To Interrogatory No. 6, which is being FILED UNDER SEAL.

[27] *ACMA USA, Inc. v. Surefil, LLC*, 2008 U.S. Dist. LEXIS 51636, at *5 (E.D. Va. July 7, 2008); *Anglin v. Vill. of Washington Park*, Civil No. 03-846-MJR, 2006 U.S. Dist. LEXIS 28606, at *2, *3 (S.D. Ill. May 9, 2006); *Doerge v. Crum's Enters.*, Case No. 05-1019-JTM, 2006 U.S. Dist. LEXIS 15717, at *9 (D. Kan. Mar. 7, 2006); *Koresko v. Bleiweis*, Civil Action No. 04-00769, 2004 U.S. Dist. LEXIS 19904, at *8–*10 (E.D. Pa. Sept. 27, 2004); *Biovail Corporation v. Mylan Laboratories, Inc.*, 217 F.R.D. 380, 381–83 (N.D. W.Va. 2003); *In re Aircrash Disaster near Roselawn*, 172 F.R.D. 295, 306, 307 (N.D. Ill. 1997); *Burns v. Imagine Films Ent't*, 164 F.R.D. 589, 592, 593 (W.D.N.Y. 1996).

[28] *See* Ex. 4, Ramey Decl. at ¶15, Ex. 8, First Amended Resp. To Interrogatory No. 6.), which is being FILED UNDER SEAL.

[29] *E.g.*, *Enron,* 258 F.R.D. 149, 159; *Hager,* 267 F.R.D. 486, 498.

[30] *See* Ex. 4, Ramey Decl. at ¶15, Ex. 8, First Amended Resp. To Interrogatory No. 6 at 24, which is being FILED UNDER SEAL; Ex. 5, Zhang depo. at 138:2-7, which is being FILED UNDER SEAL and Ex. 6, exhibit 169 to same, which is being FILED UNDER SEAL.

requested.[31] The disclosure of such information from Verizon may lead to the discovery of admissible evidence. Additionally, Traxcell is entitled to the raw data from which Verizon compute the sales data.

### C. VERIZON SHOULD BE COMPELLED TO PROVIDE 30(B)(6) TESTIMONY IN RESPONSE TO DAMAGES RELATED TOPICS

As Traxcell explained in its May 29, 2019 meet and confer and later correspondence, Verizon's 30(b)(6) testimony is woefully deficient in the areas discussed above.[32] For example, Verizon 30(b)(6) witness Brian Zhang could not answer basic damages questions at his deposition:

```
11      Q.  Just a couple quick questions.  Are you
12   prepared to provide any testimony today on monies
13   or other benefits received by Verizon for the sale
14   of wireless devices?
15      A.  Wireless devices?
16      Q.  Yes, sir.
17      A.  No.
18      Q.  As we looked at in Exhibits 155 and 156
19   or 164?
20      A.  Yeah, I do not have information.
21      Q.  You're not prepared to provide any
22   testimony on that today?
23      A.  No.
24      Q.  Is that correct?
25      A.  That's correct.
```

---

[31] *See* Ex. 4, Ramey Decl. at ¶13, Ex 7, May 16 email.
[32] *Id.* at 4, Ex. 2, June 5, 2019 email from William Ramey to counsel for Verizon requesting 30(b)(6) testimony

13

```
1      Q.   Are you prepared today to provide any
2   testimony on monies or other benefits received by
3   Verizon for the sale or use of location
4   information relating to users of its wireless
5   network?
6      A.   No.
```
[33]

Similarly, Verizon 30(b)(6) witness Steven Rice could not answer such questions:

```
 4      Q.   Do you have any information to provide
 5   today in your testimony regarding Verizon's
 6   network costs, the CAPEX costs, such as spending
 7   on cell tower base stations on an annual basis?
 8         MS. LUCIER: Objection, scope.
 9      A.   I don't have the specific numbers that
10   come out of our total capital spend that we report
11   on that is specific to just cell towers.
12   BY MR. RAMEY:
13      Q.   On base stations?
14      A.   On base stations.
15      Q.   Do you have any testimony to provide
16   today on the operational expenditures or OPEX,
17   such as the network operating expenses on an
18   annual basis starting before SON was implemented
19   until the present?
20         THE REPORTER: Starting before
21   what?
22         MR. RAMEY: Before SON was
23   implemented until the present.
24         MS. LUCIER: Objection, scope.
25      A.   Again, I don't have specific numbers
```

```
1   to the operating costs that were reporting for the
2   network except for the reviews that we have done
3   where we've tried to look for whether or not the
4   time spent post-deployment in managing SON is
5   different than what we thought we were spending
6   time on pre-SON, or just individual studies, not
7   yearly-type operating costs.
8   BY MR. RAMEY:
9      Q.   Do you have any of the operational
10  expenditure data to share today with the jury?
11     A.   No.
```
[34]

---

[33] Ex. 7, Deposition of Zhang at 187:11-188:6.) which is being FILED UNDER SEAL.
[34] Ex. 8, Deposition of Rice at 297:4-298:11, which is being FILED UNDER SEAL.

Once Verizon is compelled to provide the requested documents, then the Court should require it to provide a second 30(b)(6) deposition on damages related Topics Nos. 13-15, 19, and 28.

### III. CONCLUSION

Verizon should be ordered to produce within 14 days of the Order all documents and testimony relating to the categories of financial information above. Moreover, Verizon's refusal to comply with the Local rules and Plaintiff's requests is designed to delay and raise the cost of this litigation and Verizon should be sanctioned in an amount equal to the extra attorney's fees and expert fees required to address the lack of production.

Traxcell requests the Court overrule Verizon's discovery objections referenced above and order Verizon to provide full production and answers to the discovery discussed above.

Respectfully submitted,

**Ramey & Schwaller, LLP**

By: /s/ William P. Ramey, III
    William P. Ramey, III
    Texas Bar No. 24027643
    5020 Montrose Blvd., Suite 750
    Houston, Texas 77006
    (713) 426-3923 (telephone)

(832) 900-4941 (fax)
wramey@rameyfirm.com

**Hicks Thomas, LLP**

John B. Thomas (Co-Counsel)
Texas Bar No. 19856150
700 Louisiana Street, Suite 2000
Houston, Texas 77002
(713) 547-9100 (telephone)
(713) 547-9150 (fax)
jthomas@hicks-thomas.com

**Attorneys for Traxcell**

## CERTIFICATE OF CONFERENCE

Numerous personal conferences have occurred in this case regarding this production between Plaintiff Counsel William P. Ramey, III and Defense Counsel Allison Lucier, Kevin Anderson, Justin Lowery and/or Thad Hartfield. A formal meet and confer occurred on May 29, 2019 with Plaintiff Counsel William P. Ramey, III and Defense Counsel Allison Lucier, Kevin Anderson, Justin Lowery and/or Thad Hartfield present on the call. The topics discussed are below in black. The resolution from the meet and confer is in green.

5. Verizon's implementation of SON, in terms of:
    a. Network costs (CAPEX, such as spending on cell towers and base stations on an annual basis starting before SON was implemented until the present, and OPEX, such as network operating expenses on an annual basis starting before SON was implemented until the present)

    Verizon is not producing more than they have to date. We are at an impasse.

    b. quality of service before SON as compared to after SON (e.g., dropped calls, call quality, customer satisfaction on an annual basis starting before SON was implemented until the present))?  (we have some information related to these areas but not all)

    Verizon is not producing more than they have to date as Verizon claims not to keep records on QOS as it relates to SON.  Our position is that we should get the QOS records from before SON to the present, regardless of how they ae kept.  We are at an impasse.

    c. Personnel costs for optimizing verizon's wireless network immediately before SON as compared to after SON, i.e. how many personnel hours to monitor and optimize network before SON and after SON (what is the costs per base station/cell for personnel monitoring and optimizing the network) (we have some information related to these areas but not all)

    Verizon is not producing more than they have to date, but is considering a way to produce labor costs for filed technicians.  Our position is that we are entitled to labor costs for personnel maintaining the wireless network.  We are an impasse.

    d. (we have damage models based on this information)

6. Verizon licenses associated with:
    a. network optimization technology (SON
    Verizon has produced.

    b. Collecting and using location data of a wireless devices
    Verizon clams that we are limited to the collection of location by the SON system or how Google Maps and VZ Navigator use location collected through the API's.  Our position is that we are entitled to how Verizon determines location of a wireless device and we are not limited to how Google Maps and VZ Navigator use location collected through the API's.  we attach the claims of the '388 patent for your review and request for you to show us where you find that we are so limited by the end of the week.  We are at an impasse.  As for the SON location, we are considering Verizon's position and we will get back with you.

    c. Directional assistance wherein a wireless device accesses mapping data across the wireless network.

    Verizon clams that we are limited to how Google Maps and VZ Navigator use location collected through the API's.  Our position is that we are entitled to how Verizon determines location of a wireless device and we are not limited to how Google Maps and VZ Navigator use location collected through the API's.  we attach the claims of the '388 patent for your review and request for you to show us where you find that we are so limited by the end of the week.  We are at an impasse.

7. The methods and systems used by Defendants to generate an indication of location of a wireless device.

   See above.

8. Wireless subscriber revenue, itemized for services charged such as data, voice and messaging

   Verizon will not produce.  We are at an impasse.

9. Wireless device revenue earned by Verizon for the sales of wireless devices.

   Verizon will not produce.  We are at an impasse.

10. Revenue data for data service on Verizon's network (broken down by technology type, 2G, 3G, 4G (LTE), and 5G)

    Verizon will not produce.  We are at an impasse.

11. Volume of data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G

    Verizon will not produce.  We are at an impasse.

12. Volume of Google Maps data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G

    Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.

13. Volume of VM Navigator data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G

    Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.

14. Volume of other directional assistance programs data traffic on Verizon's wireless network, i.e. upload/download per technology type, 2G, 3G, 4G (LTE), and 5G

    Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.

15. Detailed Verizon income statement by account from the general ledger, with breakout/allocation for voice/data/messaging

    Verizon will not produce.  We are at an impasse.

16. Revenue earned by Verizon from location data of a wireless device. (including all monies/benefits Verizon receives for providing access to a wireless device's location data and revenue from selling the location information)

    Verizon will not produce.  We are at an impasse.

17. The percentage of wireless device's that allow access to location data

<span style="color:green">Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.</span>

18. The percentage of wireless devices that block access to location data

    <span style="color:green">Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.</span>

The percentage of wireless devices that block access to location data on an application basis

<span style="color:green">Verizon will not produce.  We are at an impasse, but Verizon claims not to have this information.</span>

The parties have continued to negotiate the requests, but no further progress has been made on obtaining the requested discovery.  The attempts continued on May 31, 2019, June 5, 2019 and June 6, 2019 but no agreement could be reached.

/s/ William P. Ramey, III  
William P. Ramey, III

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that all counsel of record who have appeared in this case are being served today, June 7, 2019, with a copy of the foregoing via the Court's CM/ECF system.

/s/ William P. Ramey, III  
William P. Ramey, III
